1
2
3
4
5
6
7
8
9
10
11

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KEESHAWN EUGENE SCOTT, | ) | Civil No. 07CV0492 J (CAB) |
| Petitioner, | ) | **ORDER:** |
| v. | ) | **1) ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION;** |
| LARRY SCRIBNER, Warden, | ) | **2) DENYING PETITION FOR WRIT OF HABEAS CORPUS; and** |
| Respondent. | ) | **3) DENYING REQUEST FOR AN EVIDENTIARY HEARING** |

Keeshawn Eugene Scott ("Petitioner"), a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. Petitioner challenges his San Diego Superior Court conviction in case number SCD 158106 for willful, deliberate, and premeditated attempted murder and intentionally and personally discharging a firearm causing great bodily injury. (Lodgm't No. 1 at 69.) He contends he was denied effective assistance of counsel when his attorney failed to investigate and present a PCP[1]

---

[1] Phencyclidine is an illegal substance which can induce hallucinations, delusional ideas, loss of coordination, unpredictable or violent behavior, and psychoses resembling schizophrenia. *See* the United States Drug Enforcement Administration Website at www.usdoj.gov/dea/concern/pcp.html.

07cv0492 J (CAB)

1  psychosis defense, failed to utilize funds which had been approved for the purpose of conducting

2  neuropsychological examinations, and gave perjured testimony at a hearing on a motion for a

3  new trial.  (*See* Doc. No. 1, Attach. to Pet. at 16-42.)  He also requests that this Court hold an

4  evidentiary hearing on his claims.  Before the Court is Magistrate Judge Cathy Ann

5  Bencivengo's Report and Recommendation ("R&R") recommending that the Court deny the

6  Petition. (Doc. No. 13.)  For the reasons set forth below, this Court **ADOPTS** the R&R and

7  **DENIES** the Petition in its entirety.

8

9                                          ***Factual Background***

10        This Court gives deference to state court findings of fact and presumes them to be correct.

11  Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.

12  28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of

13  historical fact, including inferences properly drawn from such facts, are entitled to statutory

14  presumption of correctness).  The facts as found by the state appellate court are as follows:

15         On the morning of February 3, 2001, . . . [Petitioner] was at the home
16    of his girlfriend, Lekisha Hayes . . . . Hayes lived with her mother (Sheila
      Lessier) and other family members.  Calvin Wilkerson, who was Lessier's
17    friend, arrived at the house around 11:00 a.m. and joined Lessier in her
      bedroom . . . . Hayes and her sister were in the kitchen preparing breakfast . .
18    . . [Petitioner] joined Hayes and her sister in the kitchen.

19         Lessier and Wilkerson had been in the bedroom for about 10 minutes
      when [Petitioner] knocked on the bedroom door, asked if he could come in and
20    sit with them, and asked if he could smoke a cigarette . . . . While the three of
      them were smoking, Lessier was cleaning and the television was on.
21    Wilkerson and [Petitioner] did not engage in any other conversation.
      [Petitioner] seemed normal and did not appear angry.  [Petitioner] and
22    Wilkerson had met before, but had never engaged in any significant
      conversations or had any problems . . . .

23         [Petitioner] was in the room less than five minutes, when all of a sudden
      Lessier heard a loud noise.  Lessier, who was standing about seven to eight
24    feet away from [Petitioner], turned and saw [Petitioner] shooting Wilkerson
      with a gun . . . . When he fired the first shot, [Petitioner] was sitting down
25    about three or four feet away from Wilkerson; as he continued to shoot he
      stood up over Wilkerson.  Lessier heard about 10 gunshots.

26         Neither Wilkerson nor Lessier had seen the gun before [Petitioner]
27    started shooting.  As he was shooting, Lessier saw that at first [Petitioner] had
      the gun partially covered by the pocket of the red sweatshirt he was wearing.
28    Then, when he was standing up, he had the gun completely out of the pocket
      with his arm extended.  It seemed to Lessier that [Petitioner] was in a daze and

                                                    2

that he had left his body. Lessier stood up and asked, "What are you doing?" and it seemed like [Petitioner] then woke up and "popped back in." [Petitioner] turned and ran out of the room.

Hayes was sitting in the living room watching television when she heard several loud bangs. She saw [Petitioner] come out of the hallway and go into the kitchen. His face appeared dazed and not like it normally looked. [Petitioner] went outside, tried unsuccessfully to open the door to Hayes' car, and then came back to the front door of the house and asked for the car keys. Lessier refused to give them to him, . . . and [Petitioner] left the area on foot.

The police found a semiautomatic handgun with a wooden handle in the crawlspace under Lessier's house. [Petitioner]'s fingerprint was found on the magazine clip in the gun. [Petitioner] was apprehended at another residence in the neighborhood, where he was found sitting on a bed smoking a cigarette. [Petitioner] told the police that he was the one they were looking for. [Petitioner] appeared calm and relaxed during the entire contact with the police. [Petitioner]'s red sweatshirt was found in plain view on the floor in a closet of the bedroom where he was arrested. The front pocket of the sweatshirt had a hole with gunshot residue on it.

The night before the shooting, [Petitioner] and Hayes had slept together at her mother's house. Hayes did not see [Petitioner] with a gun at her mother's house. However, earlier that night when they were at a friend's house, Hayes saw [Petitioner] with a black gun that had wood on it . . . . Hayes could not tell if the gun used during the shooting was the same gun as the one handled by [Petitioner] the night before.

As a result of the shooting, Wilkerson suffered life-threatening injuries and required several major surgeries . . . . Without surgery, he would have bled to death . . . . Wilkerson's surgeon estimated that six to eight bullets entered Wilkerson's body.

(Lodgm't No. 5 at 2-4.)

### Procedural Background

On March 19, 2001, the San Diego County District Attorney's Office filed an amended information charging Petitioner with one count of attempted first-degree murder, a violation of California Penal Code Sections 187(a), 664 and 189. (Lodgm't No. 1 at 3.) The Information also alleged that Petitioner had intentionally and personally discharged a gun and proximately caused great bodily injury within the meaning of Penal Code Section 12022.53(d). (*Id.*) A jury found Petitioner guilty of attempted first-degree murder and found the gun enhancement to be true. (*Id.* at 69.) Following the appointment of substitute counsel, Petitioner filed a motion for a new trial in the superior court based largely on the same grounds as his current federal petition. (*Id.* at 70.) After a hearing, the court denied the motion and sentenced Petitioner to life with the

3

1   possibility of parole on the murder count and twenty-five years to life on the gun enhancement.

2   (Lodgm't No. 2, Vol. 3 at 420-24.)

3       Petitioner appealed his conviction to the California Court of Appeal, which upheld

4   Petitioner's conviction in a written opinion.  (Lodgm't Nos. 3-5.)  He then filed a Petition for

5   Review in the California Supreme Court, which the Court denied without citation of authority.

6   (Lodgm't Nos. 6, 7.)  Following direct review, Petitioner filed a habeas corpus petition in the

7   San Diego Superior Court, which the court denied in a written opinion.  (Lodgm't No. 8, Appxs.

8   C - F.)  He then filed a habeas corpus petition in the California Appellate Court, which the court

9   denied in a written opinion.  (Lodgm't No. 9, Appx. H.)  Petitioner thereafter filed a habeas

10  corpus petition in the California Supreme Court, which the Court denied without citation of

11  authority.  (Lodgm't Nos. 9, 10.)  Finally, Petitioner filed a habeas corpus petition in the San

12  Diego Superior Court, which the court denied in a written opinion.  (Lodgm't No. 11; Resp't's

13  Ex. B.)  Petitioner filed a Habeas Corpus Petition in this Court on March 15, 2007, and

14  Respondent filed an Answer on June 8, 2007.  (Doc. Nos. 1, 8.)  Petitioner filed a Traverse on

15  July 31, 2007.  (Doc. No. 11.)

16      The last reasoned state court decision to address the merits of this claim is the state

17  appellate court's opinion denying Petitioner's habeas corpus petition.  (*See* Lodgm't No. 9,

18  Appx. H at 1-3.)  That court stated:

19          [Petitioner] filed a petition for writ of habeas corpus in superior court on May
20      21, 2004, charging [trial counsel] with ineffective assistance. The petition was based
        on a declaration from [trial counsel]'s former law partner, Steven G. Cline, that
21      charged [counsel] with, among other things, failing to investigate [Petitioner]'s drug
        problems or have him evaluated by an expert when she was aware that [he] had a
        lengthy history of severe drug abuse including use of PCP; and giving false and
22      misleading testimony at the hearing on the new trial motion to support her decision
        not to offer a mental defense. The court issued an order to show cause, but ultimately
23      denied relief in explaining the petition was untimely and [Petitioner] had not shown
        that [counsel]'s representation was deficient or that any deficiency prejudiced his
24      defense.

25          If we turn briefly to the merits, [Petitioner] offers no explanation for the
        substantial delay – i.e., why Cline delayed reading the transcript of [trial counsel]'s
26      testimony at the new trial hearing on April 12, 2002, and discussing it with Jordan
        until after the appeal was decided.  Of greater significance is the fact that [trial
27      counsel] did in fact consult experts about [Petitioner]'s mental status.  There is no
        dispute that she had [Petitioner] evaluated by a psychologist, Dr. Michel, in early
28      March 2001 to determine if she could raise a defense to premeditation. Dr. Michel
        reported that (1) [Petitioner] had no viable mental defenses; (2) his denial of shooting

                                              4

1
2
3
4
5

the victim and his claim that the eyewitnesses were lying suggested an antisocial personality disorder; and (3) the only drug Petitioner admitted using was marijuana but he denied using any on the day of the shooting. [Trial Counsel] also had [Petitioner] evaluated by Dr. Carroll in May 2001 to determine competence to stand trial. Dr. Carroll's report noted that [Petitioner] admitted smoking marijuana laced with PCP on an "occasional" basis but denied any difficulty controlling his use of the drug.  Dr. Carroll described [Petitioner] as alert and fully oriented, called his thought process illogical and goal directed, and indicated [Petitioner] was not psychotic, not delusional and not hearing voices or having visual hallucinations.

6
7
8
9

The isolated statements attributed to [Petitioner] during a jailhouse interview in August 2001 do not conceded [sic] or imply long-term, chronic or severe abuse of PCP and are not inconsistent with the psychologists' reports.  Notably, the record before this court is devoid of any evidence from [Petitioner] that he had a long history of PCP use or even that he used drugs at or about the time of the shooting. [Petitioner] has failed to raise "a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, 466 U.S. 687.)

10

The petition is denied.

11

(*Id.*)

12

### *Legal Standard*

13

### I. State Prisoner Habeas Corpus Standard

14

15

16

17

18

19

20

A federal court's duty in examining a state prisoner's habeas petition is governed by the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254.  Pursuant to the AEDPA, a federal court may grant habeas corpus relief from a state court judgment only if the adjudication was (1) contrary to, or involved an unreasonable application of, clearly established federal law, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).

21

22

23

24

25

26

27

A federal court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003).  The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case.  *Id.* at 76.  Additionally, the state court's factual determinations are presumed correct, and

28

the petitioner carries the burden of rebutting this presumption with "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal courts must independently review the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000), *overruled on other grounds by Lockyer*, 538 U.S. at 75-76; *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

## II.  Reviewing a Magistrate Judge's Report and Recommendation

The district court's duties in connection with a magistrate judge's R&R are set forth in Rule 72(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1).  *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1).  The district court must "make a *de novo* determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 676 (1980).  "When no objections are filed, the district court may assume the correctness of the magistrate judge's findings of fact and decide the motion on the applicable law."  *Johnson v. Nelson*, 142 F. Supp. 2d 1215, 1217 (S.D. Cal. 2001).  "Under such circumstances, the Ninth Circuit has held that 'a failure to file objections only relieves the trial court of its burden to give *de novo* review to factual findings; conclusions of law must still be reviewed *de novo*.' "  *Id.* (quoting *Barilla v. Ervin*, 886 F.2d 1514, 1518 (9th Cir. 1989)).  Thus, the Court conducts a *de novo* review of any factual findings to which Petitioner objects and a *de novo* review of conclusions of law.

## *Discussion*

Petitioner asserts the following claims in support of his argument that trial counsel Tracy Macuga's deficient performance violated his Sixth Amendment right to effective assistance of counsel:

1    (1) Trial counsel failed to "investigate and prepare the substancial [sic] information in

2    [P]etitioner's case supported by eyewitnesses," and failed to present this information as part of

3    Petitioner's defense. ("Claim One") (Attach. to Pet. at 1; Objs. to R&R at 2.)

4    (2) Trial counsel failed to investigate the viability of a PCP psychosis defense by using

5    court-approved funds to hire a psychologist and/or neuropsychologist to examine him. ("Claim

6    Two") (Attach. to Pet. at 1.)

7    (3) Trial counsel presented perjured testimony regarding the circumstances surrounding

8    her failure to present a mental defense at the hearing on the motion for a new trial. ("Claim

9    Three") (*Id.*) Additionally, Petitioner alleges that Macuga's incorrect testimony violated his

10   Fourteenth Amendment Due Process right to a fair hearing on his motion for a new trial. (Objs.

11   to R&R at 11-14.)

12   Respondent contends that the state courts' resolution of these claims was neither contrary

13   to, nor an unreasonable application of, clearly established federal law. (Answer at 10.)

14   **I.    Failure to Investigate and Present a Defense Based on Eyewitness**
         **Accounts**

15   In Claim One, Petitioner claims he and his family told trial counsel about his longtime

16   PCP use, his mental problems, and his unusual behavior prior to the shooting, but counsel failed

17   to investigate these facts, either on her own or by using court-approved funds for psychological

18   and neuropsychological evaluations. (Attach. to Pet. at 12-27.)[23]  In opposition to Claim One,

19

20

21

_____

22   [2] Petitioner denies, however, that he disputes trial counsel's decision not to present a PCP

23   psychosis defense or other mental defense. (*Id.* at 2.) Instead, Petitioner contends that these eyewitness accounts would rebut charges of premeditation and specific intent to commit the crime. (*Id.* at 15.)

24   Perhaps due to his lack of legal training, Petitioner did not understand that his proposed strategy would be considered a mental defense. *See People v. Montiel*, 855 P.2d 1277, 1315 (Cal. 1993) ("court must instruct sua sponte on legally available defenses, . . . which may negate specific intent"). The R&R

25   therefore did not misconstrue Petitioner's argument regarding counsel's failure to raise a mental

26   defense. (*See* R&R at 6.) The R&R did not, as Petitioner thinks, confuse the issue Petitioner raised at the hearing on his motion for a new trial with the issue raised in his Petition. (Objs. to R&R at 3-4.)

27   Rather, the R&R fully considered and correctly rejected his claim. (R&R at 13.)

28

1  Respondent contends that the state courts' resolution of these claims was neither contrary to, nor

2  an unreasonable application of, clearly established Supreme Court precedent.  (Answer at 8-10.)

3      **a.      Background**

4          **1.      Petitioner's Motion for a New Trial**

5          Following Petitioner's conviction, retained counsel filed a motion for a new trial.  At the

6  hearing on the motion, trial counsel Tracy Macuga testified that upon being appointed to

7  represent Petitioner, she read all the discovery the prosecution gave her and then interviewed

8  Petitioner.  (Lodgm't No. 2, Vol. 3 at 322.)  According to Macuga, Petitioner "insisted that he

9  did not commit the crime, that he was there, but wasn't there," and that "he was present at the

10  scene but left and someone else had shot Mr. Wilkerson."  (*Id.*)  Macuga also testified that she

11  spoke to Petitioner's family and friends who told her that Petitioner was suffering from

12  depression, had threatened to kill himself on at least one occasion, and was "acting oddly," but

13  did not tell her that Petitioner was using PCP or that he was suffering any possible symptoms of

14  PCP psychosis such as hallucinations.  (*Id.* at 322, 329-30, 341-43.)  Macuga testified at the

15  hearing that she never received any information that Petitioner was using PCP or was suffering

16  any kinds of symptoms of PCP psychosis.  However, she later stated in a sworn declaration

17  submitted to the San Diego Superior Court in support of the return to Petitioner's habeas petition

18  that Macuga told her that he had started using PCP two years before the shooting but did not

19  know when he had last used the drug.  (*Id.* at 326-27, 404-05; Lodgm't No. 8, Appx. E at 1-3.)

20  She also stated that Petitioner told her that he "heard voices in his thoughts" and that he was on

21  some type of medication.  (Lodgm't No. 8, Appx. E at 3-4.)

22          Based on the information she had obtained from discovery and interviews with Petitioner,

23  Macuga had an independent psychologist, Dr. Greg Michel, evaluate Petitioner to determine

24  whether there were any viable mental defenses to the charges.  (Lodgm't No. 2, Vol. 3 at 323.)

25  She gave Dr. Michel copies of the discovery in the case to assist him in his evaluation,

26  including: (1) the police reports, which stated that Petitioner was rumored to be a PCP addict and

27  that Petitioner was suffering from uncontrollable twitching at his arrest; (2) a videotape of

28  Petitioner's statement to police during which he was also twitching; (3) Petitioner's juvenile

1  record; (4) Macuga's interview with Petitioner; (5) a toxicology report on Petitioner which was

2  negative for any controlled substance; and (5) videotapes of Petitioner at the George Bailey

3  detention center where Petitioner was housed pending trial, taken by the prosecution, in which

4  Petitioner appeared to be a "very happy individual, dancing near phones [and] having

5  conversations" and not twitching.  (*Id.* at 324-26.)  She also told Dr. Michel that there was a

6  rumor that Petitioner was a PCP addict.  (Lodgm't No. 8, Appx. E at 2.)

7      Following the evaluation, Dr. Michel reported to Macuga that, in his opinion, Petitioner

8  suffered from antisocial personality disorder, that he was in denial with regard to his

9  responsibility for the shooting, and that there was nothing he had uncovered in his evaluation

10  which would support a mental health defense.  (Lodgm't No. 1 at 107; Lodgm't No. 2, Vol. 3 at

11  331.)  He further reported that Petitioner told him he had used marijuana in the past, but that he

12  did not use it at or near the time of the shooting.  (Lodgm't No. 1 at 106-07.)  Petitioner denied

13  committing the offense, despite the fact that Sheila Lessier and Calvin Wilkerson were

14  eyewitnesses to the shooting.  (Lodgm't No. 2, Vol. 3 at 322; Lodgm't No. 1 at 106-07.)

15      Macuga then referred Petitioner for an evaluation pursuant to California Penal Code

16  section 1368 to determine whether he was competent to stand trial.[4]  Dr. Carroll evaluated

17

18  _____

[4] Penal Code section 1368 states:

(a) If, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as
to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney
for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. If the defendant is
not represented by counsel, the court shall appoint counsel. At the request of the defendant or his or her counsel or
upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit
counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that
point in time.

(b) If counsel informs the court that he or she believes the defendant is or may be mentally incompetent,
the court shall order that the question of the defendant's mental competence is to be determined in a hearing
which is held pursuant to Sections 1368.1 and 1369.  If counsel informs the court that he or she believes the
defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall be held in the
superior court.

(c) Except as provided in Section 1368.1, when an order for a hearing into the present mental competence
of the defendant has been issued, all proceedings in the criminal prosecution shall be suspended until the question
of the present mental competence of the defendant has been determined.

If a jury has been impaneled and sworn to try the defendant, the jury shall be discharged only if it appears
to the court that undue hardship to the jurors would result if the jury is retained on call.  If the defendant is

07cv0492 J (CAB)

Petitioner.  While the Court does not have a copy of the competency report, Macuga reported in a sworn declaration that while Petitioner told Dr. Carroll he smoked marijuana laced with PCP occasionally, he did not feel any lasting effects from the drugs, was not hearing voices, and was not having hallucinations.  (Lodgm't 8, Appx. E at 2-3.)  Dr. Carroll concluded that Petitioner was competent to stand trial.  (*Id.* at 2.)

Based on the Section 1368 finding, Dr. Michel's evaluation, Petitioner's denial of involvement in the shooting, and the videotapes of Petitioner at the jail, Macuga concluded that no mental defense existed and decided to focus on a defense that Petitioner lacked the requisite intent to support an attempted murder charge.  (Lodgm't No. 2, Vol. 3 at 332-36.)  At the hearing, Macuga expressed her frustration that "there really wasn't anything there when it came to his mental health" because she felt that a mental defense was the "only hope" Petitioner had.  (*Id.* at 406.)  Macuga further testified that Petitioner was a "very, very difficult client" who was "pleasant at times, hostile at other times," and that Petitioner, "from the get-go wanted [her] to pursue an 'I didn't do it' defense," claiming that he was not there and that the eyewitnesses were lying.  (*Id.* at 406-07.)

In contradiction to Macuga's testimony, Petitioner's wife, Monique Scott, testified at the hearing that she told Macuga that Petitioner was "doing drugs," that he was talking to himself, laughing out loud inappropriately, and expressing a belief that Ms. Scott's body piercings were cameras designed to spy on him.  (*Id.* at 369.)  She also testified that she told Macuga that Petitioner had attempted suicide.  (*Id.*)  According to Ms. Scott, Macuga told her that pursuing a PCP psychosis defense would "make things worse."  (*Id.*)  Ms. Scott also testified that she gave Macuga a list of people who could confirm that Petitioner was acting strangely and using drugs.  (*Id.* at 370.)  When Ms. Scott pressed Macuga for information on how the case was progressing and whether a doctor was going to examine Petitioner, Macuga allegedly told her that no money had been approved for that purpose.  (*Id.* at 371.)  Ms. Scott said Macuga called her and other members of Petitioner's family and friends on the eve of trial and told them she was going to

declared mentally incompetent, the jury shall be discharged.

1    need them to testify as to Petitioner's strange behavior and drug use. (*Id.* at 372.) Despite this,

2    none of them was called to testify. (*Id.* at 372-73.)

3        Fessor Gray, Petitioner's father, also testified at the hearing that he told Macuga that

4    Petitioner was using drugs, was talking to himself and laughing. (*Id.* at 379.) He said Macuga

5    told him to get letters from individuals who had observed Petitioner using drugs or acting

6    strangely, which he did. (*Id.* at 381-82.) In addition, Shirley Richardson, Petitioner's aunt,

7    testified that Petitioner had attempted suicide. (*Id.* at 388.) Finally, Petitioner testified that he

8    told Macuga that he had been using PCP, and that his "drug of choice" was ecstasy and PCP.

9    (*Id.* at 391.) He also testified that he told Dr. Michel about his drug use. (*Id.* at 391.) Petitioner

10   confirmed that he told Macuga that he did not shoot Wilkerson. (*Id.* at 398.)

11       **2.    Petitioner's State Petitions for Habeas Corpus**

12       In support of a habeas corpus petition filed in San Diego Superior Court two years after

13   the motion for a new trial was denied, Petitioner's appellate attorney submitted a sworn

14   declaration from Macuga's former law partner, Steven Cline, in which Cline alleged that: (1) he

15   was "personally aware that Ms. Macuga was provided with substantial information that

16   Petitioner had a lengthy history of severe drug abuse including, but not limited to, the use of

17   PCP;" (2) Macuga failed to use state-provided funds Cline had secured for the purpose of

18   psychological and neuropsychological evaluations of Petitioner;[5] (3) he was "personally aware"

19   that Macuga did not prepare Petitioner's case for trial and that she was rarely in the office; (4) he

20   observed a "severe breakdown in the level of Ms. Macuga's professional law practice that

21   resulted in substantial problems" during their partnership; (5) he personally spoke to members of

22   Petitioner's family in an attempt to address their concerns about Macuga; and (6) upon

23   reviewing the transcript of the motion for a new trial, Cline came to believe that Macuga's

24   testimony was filled with "blatant misrepresentations, vagueness and willingness to play games

25   with semantics in order to avoid simply admitting that she had not represented Petitioner to the

26   _____

27       [5] Macuga had been appointed to represent Petitioner while she was employed by the San Diego County
Public Defender's Office. Subsequently, she left the Public Defender's Office to join Cline's private practice, and

28   Cline secured the appointment of his office to represent Petitioner, with the understanding that Macuga would
continue her representation of Petitioner after she joined the practice. (*See* Pet'r's Ex. D at 3-4.)

1    best of her abilities." (Pet'r's Ex. D at 2-5.) Macuga denied Cline's allegations in a declaration

2    submitted in support of the return to the petition. She reiterated her testimony from the hearing

3    on the motion for a new trial, and, in addition, stated that she did not discuss Petitioner's case

4    with Cline and that she was "unaware of any effort by which Mr. Cline personally sought and

5    received approval . . . for 'substantial investigation services and a thorough psychological and

6    neuropsychological evaluation' of [Petitioner]." (Lodgm't No. 8, Appx. E at 4.)

7          Cline submitted a second declaration in support of Petitioner's habeas corpus petition

8    filed in the California Court of Appeal. In it, he challenged several of the reasons given for the

9    superior court's denial of the petition and reiterated his belief that Macuga did not properly

10    prepare Petitioner's case for trial. (*See* Lodgm't No. 8, Appx. A.) He submitted a third

11    declaration in support of Petitioner's habeas petition filed in the California Supreme Court,

12    which again accused Macuga of failing to properly prepare Petitioner's case for trial. (*See*

13    Lodgm't No. 9, Appx. I.)

14          **b.    Analysis**

15                **1.    Clearly Established Supreme Court Law**

16          To establish ineffective assistance of counsel, Petitioner must first show that his trial

17    counsel's performance fell below an objective standard of reasonableness. *Strickland v.*

18    *Washington*, 466 U.S. 668, 687 (1984). "This requires a showing that counsel made errors so

19    serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

20    Amendment." *Id.* Judicial scrutiny of counsel's performance must be "highly deferential." *Id.*

21    at 689. Second, a petitioner must show counsel's deficient performance prejudiced the defense.

22    *Id.* at 687. This requires showing that counsel's errors were so serious they deprived Petitioner

23    "of a fair trial, a trial whose result is reliable." *Id.* To satisfy the prejudice prong, Petitioner

24    need only demonstrate a reasonable probability that the result of the proceeding would have been

25    different absent the error. *Id*. at 694. The prejudice inquiry is to be considered in light of the

26    strength of the prosecution's case. *Luna v. Cambra*, 306 F.3d 954, 966 (9th Cir.), *amended by*

27    311 F.3d 928 (9th Cir. 2002).

28

07cv0492 J (CAB)

In deciding whether to grant federal habeas corpus relief to a state prisoner, a federal court is not called upon to decide whether it agrees with the state court's determination. Rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). After a thorough review of the facts of this case, the Court **FINDS** that the state court's denial of Petitioner's ineffective assistance of counsel claim was not objectively unreasonable.

The state superior court stated that "there is no doubt [Macuga] did some investigation," and her investigation did not uncover any signs of long-term PCP use. (Lodgm't No. 11, Order Deny. Pet. for Writ of Habeas Corpus at 5.) Nor did Petitioner admit to long-term PCP use. (Resp't's Ex. A at 1-3.) These are factual and credibility determinations reached by the state court to which this Court must defer, as Petitioner has not rebutted them with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992). They are also amply supported by the record in this case.

Petitioner objects to the R&R's finding that Cline's second and third declarations did not allege any new facts. (Objs. to R&R at 7-8.) Specifically, Petitioner claims that Cline attached the superior court's approval of funds for investigation, and psychological and neuropsychological evaluation. (*Id.* at 7.) Petitioner argues that this attached order resolves two issues that had been disputed in the state superior court. First, that the superior court did indeed approve these funds, and second, that Mr. Cline was directly and personally involved in Petitioner's case. (*Id.*)

Cline attached a minute order from the superior court proceedings to his declaration supporting Petitioner's habeas petition to the state court of appeal. (Lodgm't No. 8, Appx. G; Lodgm't No. 11, Ex. I.) This minute order reflected the superior court's appointment of the law offices of Stephen Cline as Petitioner's trial counsel and approval of compensation and ancillary costs. (Lodgm't No. 8, Appx. G; Lodgm't No. 11, Ex. I.) The attached order does not disprove Macuga's claim that she was unaware of Cline's attempts to obtain such funds. (*See* Lodgm't

1   No. 8, Ex. 8 at 4.)  Furthermore, the court's approval of funds does not prove that further

2   investigation would have uncovered a possible mental defense.

3        The court's appointment of Cline's law office as counsel does not prove that Cline was

4   personally involved in Petitioner's defense.  Macuga started representing Petitioner as deputy

5   public defender and continued representing him after joining Cline's private law practice.

6   (Lodgm't 8, Ex. E at 1-3.)  The court's appointment order did not replace Macuga as trial

7   counsel, and is the only documentation of Cline's personal involvement in the case.  At the time

8   the state superior court considered Petitioner's first habeas petition, the court was aware that

9   Cline's office had been appointed as Petitioner's private counsel, and was aware of Cline's

10  allegation that he personally obtained court approval for ancillary funds.  Therefore, Cline's

11  attachment to his declaration in support of Petitioner's state court of appeal habeas petition did

12  not allege any new facts that were not included in his previous habeas petition.

13       Petitioner objects to the R&R's findings regarding his medical examinations on two

14  grounds.  First, Petitioner objects to the R&R's finding that "[b]ased on the information she had

15  obtained from discovery and her interview with petitioner, Macuga had an independent

16  psychologist, Dr. Greg Michel, evaluate [Petitioner]."  (Objs. to R&R at 6; R&R at 8.)

17  Petitioner does not dispute that this statement is true.  Instead, he argues that Macuga should

18  have presented Dr. Michel with all of the available evidence, including Petitioner's statements

19  and his family members' accounts, that would tend to prove Petitioner suffered from some

20  mental infirmity.  (Objs. to R&R at 6-7.)  However, Petitioner fails to demonstrate that the

21  presentation of this additional evidence would have changed Dr. Michel's evaluation.  Nor has

22  Petitioner shown that Macuga's conduct fell below an objective standard of reasonableness.  It

23  would have been reasonable for Macuga to assume that Dr. Michel would be able to determine

24  Petitioner's mental state based solely upon an in-person examination.

25       Second, Petitioner objects to the R&R's finding that "[Petitioner] told Dr. Carroll he   . . .

26  was not hearing voices and was not having hallucinations."  (*Id.*)  Petitioner claims Dr. Carroll

27  never asked him if he was hearing voices or experiencing hallucinations, and as a result,

28  Petitioner never mentioned any.  (*Id.* at 7.)  The California Court of Appeal found that Dr.

14

1   Carroll described Petitioner as alert, fully oriented, not delusional, and neither hearing voices nor

2   having visual hallucinations.  (Lodgm't No. 9, Appx. H at 3.)  Federal courts exercising habeas

3   jurisdiction should defer to state-court findings of fact unless Petitioner rebuts the findings with

4   clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1); *see also Parke v. Raley*, 506 U.S.

5   20, 35-36 (1992).  Petitioner has failed to present clear and convincing evidence rebutting the

6   state court's finding.  Therefore, this Court accepts the state court's findings regarding Dr.

7   Carroll's examination report.

8          Despite Petitioner's arguments to the contrary, the state appellate court's denial of

9   Petitioner's ineffective assistance of counsel claim was not unreasonable.  Macuga had

10  Petitioner evaluated by Dr. Michel.  The doctor's assessment of Petitioner's mental state was the

11  driving force behind Macuga's conclusion that Petitioner had no viable mental defense.  Macuga

12  made a strategic decision to focus on Petitioner's lack of specific intent as the basis of her

13  defense.  (Pet'r's Ex. D at 3.)  Petitioner himself did not claim that the shooting was due to any

14  delusions, hallucinations, voices, or other PCP psychosis symptoms.  Rather, he claimed that he

15  did not commit the shooting and that the eyewitnesses, Lessier and Wilkerson, were lying.

16  Moreover, the prosecutor threatened to introduce tapes of Petitioner, taken while Petitioner was

17  in custody awaiting trial, showing that Petitioner did not appear to suffer from any kind of

18  psychosis.  Viewing Macuga's performance through *Strickland*'s "highly deferential" lens,

19  Petitioner has not established that Macuga "was not functioning as the 'counsel' guaranteed

20  [Petitioner] by the Sixth Amendment."  *Strickland*, 466 U.S. at 687-689.  "[I]t is all too tempting

21  for a defendant to second-guess counsel's assistance after conviction or adverse sentence."  *Id.*

22  However, "strategic choices made after thorough investigation of law and facts relevant to

23  plausible options are virtually unchallengeable."  *Id.* at 690.

24         Moreover, Petitioner has not demonstrated a reasonable probability that the result of the

25  proceeding would have been different had Macuga presented a PCP psychosis defense.

26  Petitioner has not established what, if anything, counsel would have discovered had she further

27  investigated a PCP psychosis or other mental defense.  *See Strickland*, 466 U.S. at 689-94.  He

28  has not presented any new facts, declarations, psychological evaluations, or other evidence that

15

establishes that he was suffering from PCP psychosis at the time of the shooting.  To obtain federal habeas relief, it is not sufficient to present conclusory allegations which present only the possibility of error.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).  Moreover, had Macuga presented a PCP psychosis defense, the videotapes of Petitioner's behavior while he was in custody awaiting trial would likely have been admitted, severely undercutting any claim that Petitioner was suffering from psychosis at the time of the shooting.

For the foregoing reasons, the state appellate court's denial of Petitioner's ineffective assistance of counsel claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *See Williams*, 529 U.S. 362, 412-13 (2000).  He is therefore not entitled to relief on this claim.

## II.     Failure to Use Court Approved Funds for Psychological and Neuropsychological Evaluations

In Claim Two, Petitioner complains that Macuga did not make use of funds which the state court had approved for the purpose of securing psychological and neuropsychological evaluations.  (Attach. to Pet. at 1-2.)  Petitioner does not specifically allege why the failure to use the funds was unreasonable or how he was prejudiced by any such failure.  However, Petitioner's claim is essentially a restatement of his first claim, that Macuga should have more thoroughly investigated the viability of a PCP psychosis defense through further psychological and neuropsychological testing.  Respondent does not specifically address this claim in the Answer.

As discussed above, and contrary to Petitioner's claim, Macuga did secure psychological testing of Petitioner for the purpose of developing a mental defense to the charges.  (*See supra* Section I(b)(1)).  Macuga hired Dr. Michel to examine and evaluate Petitioner.  (*See* Lodgm't No. 2, Vol. 3 at 323.)  As previously noted, Michel reported that Petitioner denied responsibility for the shooting, did not admit to PCP use, and diagnosed Petitioner with antisocial personality disorder.  (Lodgm't No. 1 at 106-07.)  He also told Macuga that he did not believe there were any mental defenses available to Petitioner.  (Lodgm't No. 2, Vol. 3 at 331.)  Macuga also had Petitioner evaluated by Dr. Carroll for competency to stand trial.  Dr. Carroll reported that Petitioner was not hearing voices, was not having hallucinations, and was competent to stand

1    trial.  (Pet'r's Ex. D at 3.)  The fact that Macuga did not hire a third individual to evaluate

2    Petitioner does not establish that she was ineffective.  It was reasonable for Macuga to assume

3    that any further evaluations would not help the defense.  *See Strickland*, 466 U.S. at 687-89.  For

4    the reasons previously discussed in this Order, Petitioner also has not satisfied the second prong

5    of *Strickland* because he has not established what, if anything, further psychological testing

6    would have uncovered and how that evidence would have assisted his defense.  *See id*. at 694.

7    He has not presented any new facts, declarations, psychological evaluations or other evidence

8    that establishes he was suffering from PCP psychosis at the time of the shooting, or that the

9    result of the proceedings would have been different had Macuga secured a third psychological or

10   neuropsychological evaluation.  *See Strickland*, 466 U.S. at 689-94.; *see also James*, 24 F.3d at

11   26 (conclusory allegations which present only the possibility of error are insufficient to warrant

12   federal habeas relief).  Accordingly, Petitioner is not entitled to relief as to this claim.

13   ### III.    Perjured Testimony

14        In Claim Three, Petitioner alleges that Macuga presented perjured testimony at the

15   hearing on the motion for a new trial.  Specifically, Petitioner claims that Macuga falsely

16   testified that: (1) Petitioner never told her that he used PCP or was hearing voices/having

17   hallucinations; and (2) Petitioner's friends and family never told her that he was behaving oddly

18   in the days before the shooting.  (Attach. to Pet. at 18-20.)  Petitioner alleges he was denied his

19   due process right to a fair hearing on the motion for a new trial as a result of this perjury.

20   (Attach. to Pet. at 20.)  Petitioner raised this claim in a habeas corpus petition filed in the

21   California Supreme Court, which denied the claim without citation of authority.  (*See* Lodgm't

22   No. 10.)  The California Court of Appeal did not address Claim Three.  Therefore, the Court

23   must conduct an independent review of the record to determine whether the state court's denial

24   of this claim was contrary to, or an unreasonable application of, clearly established Supreme

25   Court law.  *See Delgado*, 223 F.3d at 982.

26        Clearly established Supreme Court law holds that "[t]he knowing use of perjured

27   testimony by a prosecutor generally requires that the conviction be set aside."  *Killian v. Poole*,

28   282 F.3d 1204, 1208 (9th Cir. 2002) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

"The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. People of the State of Ill.*, 360 U.S. 264, 269 (1959). However, the presentation of conflicting versions of events, without more, does not constitute knowing presentation of false evidence. *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (citing *United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir. 1989)). Although Petitioner's claim relates to the use of perjury at a motion for a new trial, the Court concludes that the same principles should apply as such a motion has been found to be a "critical stage" of the criminal proceedings against a defendant. *See Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir. 1990).

At the hearing on the motion for a new trial, Macuga testified that Petitioner never told her that he used PCP or that he had or was experiencing symptoms of PCP psychosis, such as having hallucinations and hearing voices. (Lodgm't No. 2, Vol. 3 at 327-28.) However, in a declaration she filed in support of the return to Petitioner's habeas corpus petition filed in superior court, Macuga stated that "[a]t the time I testified, I had not seen the case file and my handwritten notes regarding my interview with [Petitioner] for several months." Upon reviewing the case file, Macuga recalled that "[Petitioner] did indeed tell me that he began using PCP at the age of 17," that "he couldn't remember when he last used PCP," and that "he heard voices in his thoughts." (Lodgm't No. 11, Decl. of Tracy Macuga at 4.)

First, it is questionable whether Macuga, as Petitioner claims, committed perjury as it is defined by California Penal Code section 118(a):

> (a) Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which the oath may by law of the State of California be administered, *willfully and contrary to the oath, states as true any material matter which he or she knows to be false*, and every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which the testimony, declarations, depositions, or certification is permitted by law of the State of California under penalty of perjury *and willfully states as true any material matter which he or she knows to be false*, is guilty of perjury.

Cal. Pen. Code § 118 (Deering 2007) (emphasis added).

The "willfulness" element in Penal Code section 118 requires that the witness be conscious that the statement is false and with the intent that it be received as the truth. *See Ex*

*parte Lindley*, 29 Cal. 2d 709, 723 (1947).  "Reckless disregard of truth by a witness who has no belief that he is swearing falsely is not perjury, though his testimony is in fact false, and he would have made it true if he had used caution."  *Id.* at 723 (quoting *People v. Von Tiedeman*, 120 Cal. 128, 137 (1898)).  Petitioner points to Cline's declarations submitted in support of the state habeas corpus petitions as proof of his allegations.  In his declarations, Cline stated that he was "personally aware that Ms. Macuga was provided with substantial information that Petitioner had a lengthy history of severe drug abuse, including but not limited to, the use of PCP" and that Macuga did not properly prepare the case for trial.  (*See* Lodgm't No. 8, Appx. A at 2; Lodgm't No. 9, Appx. C at 2)  Cline also expressed his belief that Macuga testified falsely at the hearing about the level of her preparation of Petitioner's case.  (Lodgm't No. 9, Appx. C at 4-5.)  Macuga stated in a declaration submitted in support of the return to Petitioner's habeas corpus petition in the superior court that she had not seen her file in Petitioner's case for several months at the time she testified at the hearing on the motion for a new trial, and, upon reviewing the file, realized that Petitioner had in fact told her he used PCP and was hearing voices. (Lodgm't No. 11, Decl. of Tracy Macuga at 4.)  However, this credibility dispute has been examined and resolved in the state courts on at least two occasions, first with the superior court's denial of the motion for a new trial, when Petitioner himself testified at the hearing that he told Macuga he used PCP, and again with the denial of Petitioner's habeas corpus petition in the superior court.  (Lodgm't No. 2, Vol. 3 at 390-91; Lodgm't No. 11, Order Den. Pet'r's Pet. for Writ of Habeas Corpus.)  While the state appellate court did not explicitly address this issue in its denial, by denying Petitioner's ineffective assistance of counsel claim, that court also appears to have accepted Macuga's explanation of her apparently incorrect testimony at the hearing on the motion for a new trial.  (See Lodgm't No. 9, Appx. E.)  The Court has not been presented with any new evidence which would rebut these factual and credibility findings, and thus the Court must defer to them.  *See* 28 U.S.C. § 2254(e)(1).

Further, there is simply no evidence in the record that the prosecutor knew that Macuga's testimony was inaccurate as required by *Killian*, or that the prosecutor allowed false testimony "to go uncorrected" as required by *Napue*.  *See Killian*, 282 F.3d at 1208; *Napue*, 360 U.S. at

1    269.  Rather, the record supports a conclusion that trial counsel's incorrect testimony was based

2    on faulty memory of her interview with Petitioner, not a deliberate attempt to deceive.

3         Petitioner objects to the R&R's findings relating to Macuga's testimony at the hearing on

4    the motion for a new trial.  (Objs. to R&R at 8-9.)  First, Petitioner objects to the R&R's finding

5    that the credibility dispute was resolved in the state courts on at least two separate occasions.

6    (*Id.* at 8-10.)  Petitioner reasons that the state superior court could not evaluate Macuga's

7    credibility at the motion for a new trial hearing because she had not yet submitted her declaration

8    explaining that Petitioner did, in fact, tell her that he had used PCP.  (*Id.* at 8-9.)  The court, at

9    that point, believed Ms. Macuga's testimony that she did not recall Petitioner ever telling her he

10   used PCP or suffered from PCP psychosis-related symptoms.  Petitioner's appellate attorney

11   extensively tested her veracity on this point when he cross-examined her, but the court

12   ultimately accepted Macuga's testimony.  (*See* Lodgm't No. 2, Vol. 3 at 336-55)

13        More than four years later, Petitioner filed a petition for writ of habeas corpus in the state

14   superior court.  He again alleged that Macuga presented perjured testimony at the motion for a

15   new trial hearing.  (Lodgm't No. 11 at 9.)  Macuga responded by submitting a declaration in

16   support of the return to Petitioner's habeas corpus petition, in which she acknowledged that

17   Petitioner had told her about his PCP use.  She explained that at the time she testified, she had

18   not reread her notes and forgotten the conversation in which Petitioner told her about his PCP

19   use.  (Lodgm't 8, Appx. E at 3.)  The state superior court considered her explanation, and

20   accepted it despite Petitioner's claim that she deliberately perjured herself.  (Lodgm't No. 11,

21   Order Den. Pet'r's Pet. for Writ of Habeas Corpus.)  The state superior court therefore resolved

22   this credibility dispute on two separate occasions.  Petitioner's objection to the R&R is without

23   merit.  (*See supra* Section III at pp. 24-29.)

24        Second, Petitioner objects to the state superior court's finding that Macuga's incorrect

25   testimony was caused by her faulty memory of her conversation with Petitioner.  (Objs. to R&R

26   at 12-14.)  Petitioner, in objecting, is once again challenging the state courts' resolution of the

27   credibility dispute regarding Macuga's testimony.  This Court again reminds Petitioner that the

28

1   state courts' credibility and factual determinations cannot be overruled absent clear and

2   convincing evidence to the contrary.

3   ## IV.  Request for an Evidentiary Hearing

4           Petitioner asks this Court to conduct an evidentiary hearing because his petition "contains

5   issues and declarations that if believed [P]etitioner alleges show signs of Tracy Macuga's

6   ineffective assistance" and that an evidentiary hearing would "determine the truth in this matter."

7   (Attach. to Pet. at 27.)  Evidentiary hearings in 28 U.S.C. § 2254 cases are governed by the

8   AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary

9   hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999).  The provisions of 28 U.S.C.

10  § 2254(e)(2) control this decision:

11          (2) If the applicant has failed to develop the factual basis of a claim in State court
            proceedings, the court shall not hold an evidentiary hearing on the claim unless the
12          applicant shows that –

13          (A) the claim relies on –

14                  (i) a new rule of constitutional law, made retroactive to cases on
                    collateral review by the Supreme Court, that was previously unavailable;or
15
                    (ii) a factual predicate that could not have been previously
16                  discovered through the exercise of due diligence; and

17          (B) the facts underlying the claim would be sufficient to establish by clear and
            convincing evidence that but for the constitutional error, no reasonable factfinder would
18          have found the applicant guilty of the underlying offense.

19  28 U.S.C. § 2254(e)(2).

20          The Ninth Circuit has outlined the procedure for district courts to follow in determining

21  whether to grant an evidentiary hearing request.  First, the Court must "determine whether a

22  factual basis exists in the record to support the petitioner's claim."  *Insyxiengmay v. Morgan*,

23  403 F.3d 657, 669-70 (9th Cir. 2005) (citing *Baja*, 187 F.3d at 1078).  If not, the Court must

24  "ascertain whether the petitioner has 'failed to develop the factual basis of the claim in State

25  court.'"  *Id.*  A failure to develop the factual basis of a claim in state court implies "lack of

26  ///

27  ///

28  ///

1   diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *See*

2   *Williams v. Taylor*, 529 U.S. 420, 432 (2000).  The Supreme Court has said that "[d]iligence will

3   require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state

4   court in the manner prescribed by state law." *Id.* at 437.  If the petitioner has failed to develop

5   the factual basis for his claim in state court, "the court must deny a hearing unless the applicant

6   establishes one of the two narrow exceptions set forth in section 2254(e)(2)(A) & (B)."

7   *Insyxiengmay*, 403 F.3d at 669-70.

8          If the petitioner has not failed to develop the facts in state court, a court must consider

9   whether a hearing is appropriate under *Townsend.  See Townsend v. Sain,* 372 U.S. 293 (1963).

10  *Townsend* identified six situations in which a habeas petitioner would be entitled to an

11  evidentiary hearing:

12          (1) the merits of the factual dispute were not resolved in the state hearing; (2) the
            state factual determination is not fairly supported by the record as a whole; (3) the fact-
13          finding procedure employed by the state court was not adequate to afford a full and fair
            hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the
14          material facts were not adequately developed at the state-court hearing; or (6) for any
            reason it appears that state trier of fact did not afford the habeas applicant a full and fair
15          fact hearing.

16  *Id.* at 313.

17         Petitioner has not failed to develop the factual basis for his claim in state court. Indeed,

18  the facts supporting his claims have been developed through a hearing on the motion for a new

19  trial and three habeas corpus petitions in the state court which were supported by extensive

20  documentation and declarations.  Further, he has not satisfied any of the *Townsend* factors which

21  would entitle him to an evidentiary hearing in this Court.  The merits of the factual dispute have

22  been resolved in state court, the factual determinations reached by the state courts are fairly

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

supported by the record, he was afforded a full and fair hearing on the facts underlying his claim, and there is no newly discovered evidence. *See Townsend*, 372 U.S. at 313.  Accordingly, this Court **DENIES** Petitioner's request for an evidentiary hearing.

### *Conclusion*

For the reasons stated above, the Court **ADOPTS** the Report & Recommendation and **DENIES** Petitioner's Petition for Writ of Habeas Corpus.  Additionally, the Court **DENIES** Petitioner's Request for an Evidentiary Hearing.

DATED:  December 14, 2007

_____
HON. NAPOLEON A. JONES, JR.
United States District Judge

cc: Magistrate Judge Bencivengo
    All Parties of Record

23

07cv0492 J (CAB)